2019 IL App (4th) 170064

FILED
September 5, 2019
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| ROBERT W. EYLER JR., | ) | No. 16CF269 |
| Defendant-Appellant. | ) | |
| | ) | The Honorable |
| | ) | Scott J. Butler, |
| | ) | Judge Presiding. |

---

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justice DeArmond concurred in the judgment and opinion.
Justice Cavanagh specially concurred, with opinion.

**OPINION**

¶ 1      In May 2016, the State charged defendant, Robert W. Eyler Jr., with unlawful possession of methamphetamine. 720 ILCS 646/60(b)(1) (West 2014). In November 2016, defendant's case proceeded to a jury trial at which the State's witnesses testified essentially to the following: (1) someone called the police to report "a male subject wearing a blue sweatshirt who was on a bicycle who was yelling profanities" and acting erratically; (2) shortly after the call, the police located a suspect—later identified as defendant—who matched this description; (3) a police officer attempted to effectuate a *Terry* stop upon defendant, but he fled (see *Terry v. Ohio*, 392 U.S. 1 (1968)); (4) the police ultimately stopped defendant and placed him under arrest; and (5) a search incident to defendant's arrest revealed a white substance that later tested positive for methamphetamine. The jury found defendant guilty. In January 2017, the trial court

sentenced defendant to five years in prison and assessed various fines and fees.

¶ 2        Defendant appeals, arguing (1) his attorney was ineffective for failing to file a motion to suppress the results of the search, (2) a *Terry* stop can be justified based only upon a reasonable suspicion of ongoing criminal activity as opposed to a completed crime, and (3) the trial court erred when it imposed various fines and fees. We affirm.

¶ 3                            I. BACKGROUND

¶ 4        In May 2016, the State charged defendant with unlawful possession of methamphetamine. 720 ILCS 646/60(b)(1) (West 2014). In November 2016, defendant's case proceeded to a jury trial, and the following testimony was presented.

¶ 5        Officer J.D. Summers of the Quincy Police Department testified that on the morning of May 4, 2016, he was dispatched to the vicinity of North 12th and North 13th Streets, between Spring and Elm Streets, because of "a call in reference to a male subject wearing a blue sweatshirt who was on a bicycle who was yelling profanities and just acting erratically, and [the caller] thought it was suspicious." See 720 ILCS 5/26-1(a)(1) (West 2014) (a defendant commits disorderly conduct when he knowingly does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace).

¶ 6        Summers stated that he quickly responded to this area while he was driving a marked police car and "observed a male subject matching that description in that he was wearing a blue-hooded sweatshirt [and was] riding a bicycle." Summers testified that he followed closely behind the bicyclist—whom he later identified as defendant—and yelled "Sir" very loudly on multiple occasions. Defendant "began pedaling faster" when Summers shouted. Summers stated that he then yelled "Sir" even louder and defendant then "began to cut through yards westbound off the alley." Summers testified that he was "unable to follow him in my patrol vehicle. I mean,

he was on a bicycle pedaling fast, so there was—I wasn't going to catch up to him on foot ***." Summers stated that he then "notified other units via our radio in reference to the situation that I had a male subject who fled from me."

¶ 7 Summers testified that officers from the Quincy Police Department and the Adams County Sheriff's Department "converged in the area" and "began field interviews with neighbors and such because we continued to have neighbors say that they spotted this subject running now on foot through yards. Also within this process there were two officers that observed the subject running on foot from us."

¶ 8 Officer Jessica Willis of the Quincy Police Department stated that she and other officers responded on the morning of May 4, 2016, to assist Summers. Willis testified that she was given a description of a male wearing a blue colored sweatshirt running through an alley and she and other officers "set up a perimeter in the area that was described." Willis stated that she "saw a male matching the description run across the street." She stated that she followed the suspect—whom she later identified as defendant—in her squad car. Defendant continued running, and she testified that she and other officers "got out on foot and ran after the subject." Willis testified that she "identified [herself] as a police officer numerous times, yelling at him to stop, and eventually he did lay down in a backyard."

¶ 9 She testified that defendant did not stop until he was essentially surrounded. She also stated that a deputy pointed his pistol at defendant and ordered him to get down on the ground. Willis testified that officers searched defendant after he stopped and they handed her a wallet and a metal pipe from defendant's person. Willis testified that she found a "green leafy substance" inside the wallet and that pipes are "commonly used to smoke marijuana."

¶ 10 Officer Summers testified that he next saw defendant, who at that point was in

police custody, approximately 10 minutes after defendant had fled from him. Summers testified that he (1) took defendant into custody, (2) performed a "secondary search" of defendant's person for safety purposes, and (3) found a drinking straw inside defendant's pocket that had "some white residue in it." Joshua Stern, a forensic scientist with the Illinois State Police, stated that he tested this residue and "confirmed the presence of methamphetamine."

¶ 11        After the State rested, defendant presented no evidence. The jury found defendant guilty of unlawful possession of methamphetamine. In January 2017, the trial court sentenced defendant to five years in prison and assessed various fines and fees.

¶ 12        This appeal followed.

¶ 13                                    II. ANALYSIS

¶ 14        Defendant appeals, arguing (1) his attorney was ineffective for failing to file a motion to suppress the results of the search, (2) a *Terry* stop can be justified based only upon a reasonable suspicion of ongoing criminal activity as opposed to a completed crime, and (3) the trial court erred when it imposed various fines and fees. We address these issues in turn.

¶ 15                        A. Ineffective Assistance of Counsel

¶ 16        Defendant first argues that his attorney was ineffective for failing to file a motion to suppress the results of the search. We disagree.

¶ 17                            1. *The Applicable Law*

¶ 18        A defendant has the right to effective assistance of counsel at all critical stages of a criminal proceeding. U.S. Const., amend. VI; *People v. Hughes*, 2012 IL 112817, ¶ 44, 983 N.E.2d 439. "To establish a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was (1) deficient and (2) prejudicial." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 81. An attorney's performance is deficient when it falls below an objective

standard of reasonableness. *Id.* ¶ 82. Courts are highly deferential of counsel's performance, and a defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327, 948 N.E.2d 542, 547 (2011).

¶ 19    To establish prejudice, a defendant must show that, but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 63, 115 N.E.3d 1148. "In the context of failure to file a motion to suppress, prejudice arises when a defendant demonstrates (1) that the unargued suppression motion would have been meritorious and (2) that a reasonable probability exists that the outcome of the trial would have been different had the evidence been suppressed." *People v. Bates*, 2018 IL App (4th) 160255, ¶ 48, 112 N.E.3d 657.

¶ 20    Defendant's claim of ineffective assistance of counsel requires us to discuss the offenses of disorderly conduct and resisting or obstructing a peace officer, as well as the law governing *Terry* stops. We do so as follows.

¶ 21    a. Disorderly Conduct and Resisting or Obstructing a Peace Officer

¶ 22    A defendant commits disorderly conduct when he knowingly engages in conduct that (1) is unreasonable, (2) alarms or disturbs another, and (3) provokes a breach of the peace. 720 ILCS 5/26-1(a)(1) (West 2014). "Generally, to breach the peace, a defendant's conduct must threaten another or have an effect on the surrounding crowd." *People v. McLennon*, 2011 IL App (2d) 091299, ¶ 31, 957 N.E.2d 1241. "However, a breach of the peace can occur without overt threats or profane and abusive language." *Id.* "Disorderly conduct is loosely defined. As a highly fact-specific inquiry, it 'embraces a wide variety of conduct serving to destroy or menace the public order and tranquility.' " *Id.* ¶ 30 (quoting *In re B.C.*, 176 Ill. 2d 536, 552, 680 N.E.2d

1355, 1363 (1997)).

¶ 23    A defendant commits the offense of resisting or obstructing a peace officer when he knowingly resists or obstructs the performance of any authorized act within the official capacity of one known to him to be a peace officer. 720 ILCS 5/31-1(a) (West 2014). A defendant "who runs away from an unlawful *Terry* stop is not resisting or obstructing an authorized act of the police officer." *People v. Shipp*, 2015 IL App (2d) 130587, ¶ 50, 34 N.E.3d 204. "However, such flight does provide police with probable cause to arrest for obstructing a peace officer if, before defendant fled, the officer in question was justified in detaining defendant at the time of the flight." *People v. Johnson*, 408 Ill. App. 3d 107, 122, 945 N.E.2d 2, 15 (2010); see also *People v. Moore*, 286 Ill. App. 3d 649, 654, 676 N.E.2d 700, 704 (1997).

¶ 24                           b. *Terry* Stops

¶ 25    The United States Constitution and the Illinois Constitution protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. "[T]he touchstone of the fourth amendment is reasonableness, which is measured objectively by examining the totality of the circumstances surrounding a police officer's encounter with a citizen." *People v. Lake*, 2015 IL App (4th) 130072, ¶ 28, 28 N.E.3d 1036.

¶ 26    "It is well settled that not every encounter between the police and a private citizen results in a seizure." *People v. Luedemann*, 222 Ill. 2d 530, 544, 857 N.E.2d 187, 196 (2006).

> "Police-citizen encounters are divided into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, commonly referred to as '*Terry* stops,' which must be supported by reasonable, articulable suspicion of criminal activity; and (3) consensual encounters, which involve no coercion or detention and thus do not implicate the fourth amendment." *Lake*,

2015 IL App (4th) 130072, ¶ 35.

¶ 27    "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *People v. Grant*, 2013 IL 112734, ¶ 11, 983 N.E.2d 1009. "Whether probable cause exists is governed by commonsense considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt." *Id.* "Indeed, probable cause does not even demand a showing that the belief that the suspect has committed a crime be more likely true than false." *People v. Wear*, 229 Ill. 2d 545, 564, 893 N.E.2d 631, 643 (2008).

¶ 28    "In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court provided an exception to the warrant and probable cause requirements." *People v. Walker*, 2013 IL App (4th) 120118, ¶ 33, 995 N.E.2d 351. "Pursuant to *Terry*, a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to commit, a crime." *People v. Timmsen*, 2016 IL 118181, ¶ 9, 50 N.E.3d 1092. A *Terry* stop "must be justified at its inception, and the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Internal quotation marks omitted.) *People v. Colyar*, 2013 IL 111835, ¶ 40, 996 N.E.2d 575. The officer's level of suspicion "must be more than an inarticulate hunch." *Id.* "The officer's conduct is judged by an objective standard, which analyzes whether the facts available to the officer at the moment of the stop justify the action taken." *People v. Hill*, 2019 IL App (4th) 180041, ¶ 17, 123 N.E.3d 1236.

¶ 29    Alternatively, when an officer approaches an individual without reasonable suspicion or probable cause, that person "has a right to ignore the police and go about his

business." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Furthermore, "any refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." (Internal quotation marks omitted.) *Id.* However, "unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." *Id.* To this point, the United States Supreme Court has recognized that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. [Citations.] Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* at 124. Moreover, the Illinois Supreme Court has concluded that "[u]nprovoked flight in the face of a potential encounter with police may raise enough suspicion to justify the ensuing pursuit and investigatory stop." *People v. Thomas*, 198 Ill. 2d 103, 113, 759 N.E.2d 899, 904-05 (2001).

¶ 30        "Where an informant's tip is received by telephone, it may form the basis for a lawful *Terry* stop, but the information must bear some indicia of reliability, and the information upon which the police act must establish the requisite quantum of suspicion." *People v. Ledesma*, 206 Ill. 2d 571, 583, 795 N.E.2d 253, 262 (2003). Factors to consider when evaluating the reliability of a tip include (1) whether the tip provides a sufficient quantity of information so that the officer may be certain that the stopped individual is the one the tipster identified; (2) the time interval between the officer receiving the tip and locating the suspect; (3) whether the tip is based upon contemporaneous eyewitness observations; (4) whether the tip is sufficiently detailed to permit the reasonable inference that the tipster has actually witnessed a crime; and (5) whether the tip was made to a police emergency number. *People v. Shafer*, 372 Ill. App. 3d 1044, 1050, 868 N.E.2d 359, 363 (2007); see also *People v. Rollins*, 382 Ill. App. 3d 833, 837, 892 N.E.2d 21, 24 (2008). Furthermore, "[a] tip providing predictive information and readily observable

details will be deemed more reliable if these details are confirmed or corroborated by the police." *People v. Sanders*, 2013 IL App (1st) 102696, ¶ 15, 986 N.E.2d 114; see also *Navarette v. California*, 572 U.S. 393, ___, 134 S. Ct. 1683, 1689 (2014) (for caller who provided a tip to the police, "[a]nother indicator of veracity is the caller's use of the 911 emergency system."). The Court also noted in *Navarette* that a "911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Navarette*, 572 U.S. at ___, 134 S. Ct. at 1689.

¶ 31        In *Thomas*, 198 Ill. 2d at 106, which is remarkably similar to the present case, the defendant rode his bicycle past a police officer. This officer, who had previously arrested the defendant for drug offenses, intended to stop him for a "field interview" based upon a confidential informant's tip that the defendant was delivering illegal drugs. *Id.* The officer, while driving a squad car without the emergency lights activated, passed the defendant and positioned his car across defendant's expected path. *Id.* The defendant abruptly turned into an alleyway and departed at an accelerated speed. *Id.* A second police officer, upon seeing the defendant's evasion, drove down the alley and directed the defendant to stop. *Id.* at 107. The defendant failed to comply and continued to flee. *Id.* The defendant eventually abandoned his bicycle and ran into a field. *Id.* The first officer exited his squad car and captured the defendant on foot. *Id.* Ultimately, the officers arrested the defendant for obstructing a peace officer and recovered what appeared to be crack cocaine from the defendant's person. *Id.* The defendant moved to suppress this evidence. *Id.* at 106. The trial court granted the defendant's motion to suppress, but the Fifth District reversed. *People v. Thomas*, 315 Ill. App. 3d 849, 858-59, 734 N.E.2d 1015, 1022-23 (2000).

¶ 32        The Illinois Supreme Court granted the defendant's petition for leave to appeal,

and the defendant's sole contention before that court was that the first officer "effected the investigatory stop without having the requisite degree of suspicion to support it." *Thomas*, 198 Ill. 2d at 110. The Illinois Supreme Court, relying extensively upon the Fifth District's analysis, first concluded that the officer's attempt for a "field interview" was an attempted *Terry* stop instead of a consensual police-citizen encounter. *Id.* at 112. However, the court further concluded that the officer's "attempt to effect an unlawful stop did not implicate the fourth amendment because the defendant took flight and prevented it." (Internal quotation marks omitted.) *Id.* Instead, the Illinois Supreme Court decided to examine the officer's "basis for a seizure of the defendant's person at that point in time when he was successful in effecting it." (Internal quotation marks omitted.) *Id.* at 113. The court noted that "[u]nprovoked flight in the face of a potential encounter with police may raise enough suspicion to justify the ensuing pursuit" and that the defendant's response "was nothing short of headlong flight. *** There was nothing to suggest that the defendant was merely exercising the right to continue on his way or to cause confusion between the exercise of that right and a pure act of evasion." (Internal quotation marks omitted.) *Id.* at 113-14. Accordingly, the Illinois Supreme Court concluded that there was no unlawful seizure because the "defendant's flight, induced by [the officer's] effort to effect an unwarranted investigatory stop, turned [the officer's] otherwise ungrounded suspicion into a suspicion that justified defendant's ultimate stop and detention." *Id.* at 113.

¶ 33                                              2. *This Case*

¶ 34            In this case, Officer Summers was dispatched for "a call in reference to a male subject wearing a blue sweatshirt who was on a bicycle who was yelling profanities and just acting erratically and [the caller] thought it was suspicious." Shortly thereafter, Summers "observed a male subject matching that description in that he was wearing a blue-hooded

sweatshirt [and] riding a bicycle." Summers attempted to speak with defendant, but he "began pedaling faster" and "cut through yards westbound off the alley." Officer Willis was dispatched to assist and "saw a male matching the description run across the street." She stated that she and other officers "got out on foot and ran after the subject. I identified myself as a police officer numerous times, yelling at him to stop, and eventually he did lay down in a backyard."

¶ 35        We conclude that Officer Summers was justified in attempting to effectuate a *Terry* stop. The record shows that some concerned citizen called the police to report that a man wearing a blue sweatshirt and riding a bicycle was yelling profanities and acting erratically, and Summers shortly thereafter observed a suspect who matched this description. A call made to a police emergency number—which appears to have occurred in this case—is a factor indicating that the tip is reliable. *Shafer*, 372 Ill. App. 3d at 1050. Furthermore, we deem this tip reliable because (1) the tip provided a sufficient quantity of information so that the officer could be certain that the person stopped was the one the tipster identified, (2) there was a short time interval between the police receiving the tip and locating the suspect, and (3) the tip appeared to be based upon a contemporaneous observation of a criminal offense. See *id.* Accordingly, due to the nature of the tip, Summers was justified in attempting to effectuate a *Terry* stop to further investigate whether defendant committed disorderly conduct. Thus, once defendant began his unprovoked flight in response to the attempted *Terry* stop, the officers had probable cause to arrest defendant for resisting a peace officer. *Johnson*, 408 Ill. App. 3d at 122 (holding that flight from a lawful *Terry* stop provides the police with probable cause to arrest a defendant for obstructing a peace officer).

¶ 36        We earlier mentioned that a defendant who raises the claim of ineffective assistance of counsel must overcome the strong presumption that the challenged action or

inaction may have been the product of sound trial strategy. *Manning*, 241 Ill. 2d at 327. When, as here, defendant seeks to raise such a claim based upon defendant's assertion that his trial counsel should have filed a motion to suppress, his burden to overcome this "strong presumption" is particularly significant. That is because the record (in the absence of a motion to suppress) will rarely show all of the information the police had or the reasons explaining their actions because—again, in the absence of a motion to suppress—there would be no reason for the State to present such evidence. So, defendant essentially is asking this court to assume that no further evidence could have been presented to justify the search that occurred, but this court has no reason to engage in such an assumption.

¶ 37    For instance, if a motion to suppress had been filed in this case, here are just a few of the questions that could have been addressed by the State in response to that motion: (1) Which officer from the Quincy Police Department received the citizen's call that resulted in the police activity? (2) Did the caller identify himself or herself or otherwise provide identifying information? (3) Did the caller provide any additional information of any kind to the Quincy police officer who received the call? and (4) Was the call recorded, and if so, is that recording still available?

¶ 38    Given the circumstances of this case, there is no reason to think that the limited information transmitted to Summers was the only information possessed by the Quincy police officer who received the original call. That is, there would be no reason for the dispatch from the Quincy Police Department to officers like Summers to contain details, such as the identity of the caller, how many people may have observed the defendant's behavior, or the extent to which the caller or anyone else was alarmed or disturbed by the defendant's behavior.

¶ 39    A further difficulty with defendant's position is that it assumes defendant's trial

counsel neither had nor sought any of this information; however, we have no reason to believe that is the case. After all, this is an extraordinarily simple case factually, and it is entirely possible that defendant's trial counsel could have made inquiries of the Quincy Police Department to find out which officer received the initial call and then to seek additional information about that call from that officer. Had counsel done any of that and learned that in fact there was additional information the police learned that justified their subsequent actions regarding defendant, that would fully explain why, as an officer of the court, counsel might have chosen not to file a motion to suppress evidence. See *People v. Ewing*, 377 Ill. App. 3d 585, 593, 880 N.E.2d 587, 595 (2007) ("Under the 'collective- or imputed-knowledge' doctrine, information known to all of the police officers acting in concert can be examined when determining whether the officer initiating the stop had reasonable suspicion to justify a *Terry* stop."); see also *People v. Fonner*, 385 Ill. App. 3d 531, 541, 898 N.E.2d 646, 655 (2008) ("When officers are working together, the knowledge of each is the knowledge of all, and the arresting officer has the right to rely on the knowledge of the officer that gave the command to arrest together with his own personal knowledge." (Internal quotation marks omitted.)). So, by raising the claim of ineffective assistance of counsel, defendant is asking us to presume the worst of his trial counsel—that is, that counsel did not bother to investigate any of these questions and that, had counsel done so, counsel's filing of a motion to suppress would have been meritorious.

¶ 40　　　Even if we were to assume that Summers's attempted *Terry* stop was unlawful, his attempt to stop defendant "did not implicate the fourth amendment because the defendant took flight and prevented it." (Internal quotation marks omitted.) *Thomas*, 198 Ill. 2d at 112; see *California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("An arrest requires *either* physical force *** *or*, where that is absent, *submission* to the assertion of authority." "The narrow question before

- 13 -

us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not." (Emphases in original.)).

¶ 41 Furthermore, again assuming Summers's attempted *Terry* stop was unlawful, "[the] defendant's flight, induced by [Summers's] effort to effect an unwarranted investigatory stop, turned [his] otherwise ungrounded suspicion into a suspicion that justified defendant's ultimate stop and detention." *Thomas*, 198 Ill. 2d at 113. Stated simply, when the tip to the police was combined with defendant's unprovoked flight, the police then had reasonable suspicion to believe that defendant committed the offense of disorderly conduct. See *Wardlow*, 528 U.S. at 124 ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). Accordingly, once defendant fled, Officer Willis then had lawful authority to conduct a *Terry* stop. See *Thomas*, 198 Ill. 2d at 112. When defendant continued to flee lawful orders to stop, the police had probable cause to arrest defendant for resisting a peace officer. *Johnson*, 408 Ill. App. 3d at 122.

¶ 42 Ultimately, because defendant's arrest was lawful, a motion to suppress the results of the search incident to his arrest would not have been meritorious. See *People v. Cregan*, 2014 IL 113600, ¶ 25, 10 N.E.3d 1196. Therefore, we reject defendant's ineffective assistance of counsel argument.

¶ 43 B. Defendant's "Ongoing Crime" Argument

¶ 44 Based upon *Navarette*, 572 U.S. at ___, 134 S. Ct. at 1690, defendant argues that a *Terry* stop can be justified based only upon a reasonable suspicion of ongoing criminal activity as opposed to a completed crime. We reject this argument.

¶ 45 In *Navarette*, a caller reported that a pickup truck had driven her off the roadway.

- 14 -

*Id.* at ___, 134 S. Ct. at 1689. The caller reported the approximate location of the incident, a description of the truck, and the truck's license plate number. *Id.* at ___, 134 S. Ct. at 1686. Approximately 20 minutes later, a police officer observed a truck that matched the caller's description. *Id.* at ___, 134 S. Ct. at 1687. Officers followed the truck for approximately five minutes but were unable to observe any traffic violations or other suspicious behavior. See *id.* at ___, 134 S. Ct. at 1696 (Scalia, J., dissenting, joined by Ginsburg, Sotomayor, and Kagan, JJ.). Notwithstanding this, an officer pulled over the truck based upon the caller's tip. *Id.* at ___, 134 S. Ct. at 1686-87 (majority opinion). As officers approached the truck, they smelled marijuana. *Id.* at ___, S. Ct. at 1687. A subsequent search of the truck revealed 30 pounds of marijuana. *Id.* at ___, 134 S. Ct. at 1687. The defendants unsuccessfully moved to suppress the evidence, arguing that the traffic stop violated the fourth amendment because the officer lacked a reasonable suspicion of criminal activity. *Id.* at ___, 134 S. Ct. at 1687. The California Court of Appeal affirmed, concluding (among other matters) that "the caller reported driving that was sufficiently dangerous to merit an investigative stop without waiting for the officer to observe additional reckless driving himself." *Id.* at ___, 134 S. Ct. at 1687.

¶ 46        The United States Supreme Court concluded that the tip was sufficiently reliable because (1) the call included key information about the truck, (2) the caller reported the incident using an emergency police number, and (3) the alleged conduct bore "too great a resemblance to paradigmatic manifestations of drunk driving to be dismissed as an isolated example of recklessness." *Id.* at ___, ___, 134 S. Ct. at 1688-89. In passing, the Court noted that it needed to "determine whether the 911 caller's report of being run off the roadway created reasonable suspicion of an ongoing crime such as drunk driving as opposed to an isolated episode of past recklessness." *Id.* at ___, 134 S. Ct. at 1690.

¶ 47    We conclude that the *Navarette* Court did not somehow create a *per se* rule that a *Terry* stop can be justified *only* by ongoing criminal activity as opposed to completed or future criminal activity. Instead, we believe the context of the Court's use of the phrase "ongoing crime" was an indication of the Court's understanding of the seriousness of the circumstances as understood by the police officer who made the stop in *Navarette*, helping the Court to determine whether the situation the officer confronted was serious enough to warrant a *Terry* stop. In support of our conclusion, we note that both the majority and the dissenters in *Navarette* primarily addressed the reliability of the caller's tip and whether it justified the officer's investigative stop, particularly given that the officer involved saw no traffic violation before making that stop.

¶ 48    No Supreme Court justice in *Navarette* pointed to the phrase "ongoing crime" as having any particular significance for the resolution of that case. Under these circumstances, we find it impossible to believe that the United States Supreme Court—in such an apparently off-hand manner—somehow massively revised one of its most significant and carefully followed decisions governing police-citizen encounters.

¶ 49    The Court's *Terry* decision is 51 years old and has seemingly been universally understood for half a century as standing for the following proposition: "The typical *Terry* stop involves the temporary seizure of a person who is himself suspected of being directly involved in past, present[,] or pending criminal activity." 4 Wayne R. LaFave, Search and Seizure § 9.2(b), at 377 (5th ed. 2012). In his comprehensive treatise, Professor LaFave cites hundreds of state and federal cases dealing with *Terry* stops. We also note that in Professor LaFave's cumulative supplement to Volume 4, he discusses *Navarette* (4 Wayne R. LaFave, Search and Seizure § 9.2(a) (5th ed. Supp. 2018-19), at 57-58) and suggests the discussion of " 'an ongoing crime' "

in *Navarette* seems to be connected to how the police may have evaluated the seriousness of the report they received of possible criminal activity. (See also *id.* § 9.3(a) (further discussing *Navarette*). *Nowhere* in LaFave's universally well-regarded treatise is there any suggestion that *Navarette* somehow undid almost half a century of everyone's understanding of what *Terry* stood for.

¶ 50    In further support of this view, we again cite the decision of the Illinois Supreme Court in *People v. Thomas* we have already discussed extensively. In *Thomas*, the Illinois Supreme Court wrote the following: "Under the *Terry* exception, a police officer may briefly stop a person for temporary questioning if the officer reasonably believes that the person has committed, or is about to commit, a crime." *Thomas*, 198 Ill. 2d at 109. The *Thomas* court also wrote the following:

> "The *Terry* standards have been codified in our Code of Criminal Procedure of 1963. [Citations.] Section 107-14 of the Code provides, in pertinent part: 'A peace officer *** may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit[,] or has committed an offense ***.' 725 ILCS 5/107-14 (West 1998). The same standard is applied in determining the propriety of an investigatory stop under article I, section 6, of the 1970 Illinois Constitution (Ill. Const. 1970, art. I, § 6)." *Id.*

¶ 51    We further note that *Thomas* is hardly the last time the Illinois Supreme Court has discussed *Terry*. That court has repeatedly stated that a *Terry* stop may be justified by completed criminal activity. See *Timmsen*, 2016 IL 118181, ¶ 9 ("Pursuant to *Terry*, a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the

- 17 -

person has committed, or is about to commit, a crime."); *People v. Close*, 238 Ill. 2d 497, 505, 939 N.E.2d 463, 467 (2010) ("Under *Terry*, a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to, commit a crime."); *People v. Johnson*, 237 Ill. 2d 81, 89, 927 N.E.2d 1179, 1185 (2010) ("Under the *Terry* exception, a police officer may briefly stop a person for temporary questioning if the officer reasonably believes the person has committed, or is about to commit, a crime."); *People v. Smith*, 172 Ill. 2d 289, 297, 665 N.E.2d 1215, 1219 (1996) ("An officer may make a valid investigatory stop, absent probable cause to arrest, provided the officer can reasonably infer from specific and articulable facts that the individual in question has committed or is about to commit a crime."). We also note that *Timmsen* was decided two years *after Navarette*. Thus, defendant's "ongoing crime" argument is clearly inconsistent with Illinois Supreme Court precedent.

¶ 52        We are aware that a panel of the First District, relying upon *Navarette*, has apparently adopted a *per se* rule that a tip will justify a *Terry* stop only if there is evidence of an ongoing crime. See *People v. Lopez*, 2018 IL App (1st) 153331, ¶¶ 24-28, 112 N.E.3d 1069. For the reasons already stated, we believe the *Lopez* court has incorrectly viewed *Navarette*, and we decline to follow *Lopez*. We note that the *Lopez* court relied in part upon this district's analysis in *Shafer*, 372 Ill. App. 3d at 1050, in order to reach its conclusion that a tip must be based upon an ongoing crime. However, that reliance is misplaced; *Shafer* does not stand for the proposition that a reliable tip *must* be based upon observing an ongoing crime. See *id.* at 1054 (noting that *one factor* of reliability is whether the tip was based upon a contemporaneous eyewitness observation).

¶ 53        We also note that a panel of the First District has concluded that "flight alone is

not sufficient to establish reasonable suspicion that a person has committed, or is about to commit, a crime." *People v. Hyland*, 2012 IL App (1st) 110966, ¶ 32, 981 N.E.2d 414; see also *People v. Harris*, 2011 IL App (1st) 103382, ¶ 12, 957 N.E.2d 930; see also *In re D.L.*, 2017 IL App (1st) 171764, ¶ 28. However, this statement is inconsistent with Illinois Supreme Court doctrine. See *Thomas*, 198 Ill. 2d at 113 ("Unprovoked flight in the face of a potential encounter with police may raise enough suspicion to justify the ensuing pursuit and investigatory stop.").

¶ 54                                    C. Fines and Fees

¶ 55        Last, defendant argues that the trial court erred when it imposed various fines and fees. However, the Illinois Supreme Court has recently promulgated Rule 472, which provides in criminal cases that the trial court "retains jurisdiction" even during "the pendency of an appeal" to correct "[e]rrors in the imposition or calculation of fines, fees, assessments, or costs." Ill. S. Ct. R. 472(a)(1) (eff. Mar. 1, 2019). Thus, we decline to address this matter because the trial court still has jurisdiction to correct any alleged error. See *Sturgeon*, 2019 IL App (4th) 170035, ¶ 120 (declining to address arguments regarding fines and fees because the trial court still had jurisdiction to correct any alleged error).

¶ 56                                    III. CONCLUSION

¶ 57        For the reasons stated, we affirm defendant's conviction.

¶ 58        Affirmed.

¶ 59        CAVANAGH, J., specially concurring:

¶ 60        I concur with the majority's decision to affirm the trial court's judgment, and the reason for my concurrence is that Summers saw defendant "cut through yards westbound off the alley." That personal observation by Summers would have aroused a reasonable suspicion, under the circumstances, that defendant had committed the offense of criminal trespass to real property

(720 ILCS 5/21-3(a)(2) (West 2014)).

¶ 61    Granted, the record appears to lack any evidence that the land was posted. See *id.* §§ 21-3(b), (b-5). Even so, police officers "may make a lawful *Terry* stop without first determining whether the circumstances [they] observed would satisfy each element of a particular offense." *People v. Little*, 2016 IL App (3d) 130683, ¶ 18 "Applying that rule in this particular case, [the police officer] was not required to have evidence that the notice element of criminal trespass to real property was satisfied before he could make an investigatory stop [of defendant] to investigate a possible commission of that offense." *Id.*

¶ 62    Summers might have lacked an opportunity, at first, to ascertain whether there were any no-trespassing signs. "The purpose of a *Terry* stop is to allow a police officer to investigate the circumstances that provoke suspicion and either confirm or dispel his suspicions." (Internal quotation marks omitted.) *Close*, 238 Ill. 2d at 512. Among the questions that legitimately could have been investigated in a *Terry* stop was whether any of the yards on which defendant had trespassed were posted (see 720 ILCS 5/21-3(b-5) (West 2014)) or whether defendant previously received notice that going onto those yards was forbidden (see *id.* § 21-3(b)). If a police officer sees someone go onto land—especially the curtilage of houses—and the officer reasonably suspects that the person lacks permission to go onto the land, the officer surely is justified in stopping the person and asking questions.

¶ 63    After Summers saw defendant apparently trespassing on private property (at minimum, a civil trespass and possibly also a criminal trespass), the police had legitimate grounds for a *Terry* stop. Defendant failed to comply immediately with Willis's commands to stop, even though she repeatedly identified herself as a police officer and yelled at him to stop. "[F]light does provide police with probable cause to arrest for obstructing a peace officer [(720

- 20 -

ILCS 5/31-1(a) (West 2008))] if, before [the] defendant fled, the officer in question was justified in detaining defendant at the time of the flight." *Johnson*, 408 Ill. App. 3d at 122. Given such justification, the search of defendant's person was a search incident to a valid arrest. See *People v. Cregan*, 2011 IL App (4th) 100477, ¶ 21.

¶ 64    While concurring on that narrow rationale and thereby following *Little*, I find myself in respectful disagreement with several points in the majority's decision. Allow me to explain my concerns under the following headings.

¶ 65                              A. Disorderly Conduct

¶ 66    The majority writes: "Summers was justified in attempting to effectuate a *Terry* stop to further investigate whether defendant committed disorderly conduct." *Supra* ¶ 35. I disagree.

¶ 67    To commit disorderly conduct, defendant would have had to cause a breach of the peace: He would have had to "incite[ ] public turbulence" and "destroy[ ] or menac[e] public order and tranquility." (Internal quotation marks omitted.) *People v. Allen*, 288 Ill. App. 3d 502, 506 (1997); see also *People v. Bradshaw*, 116 Ill. App. 3d 421, 422 (1983); *People v. Kellstedt*, 29 Ill. App. 3d 83, 85 (1975). The public's sensibilities are tough enough that mere swearing, typically, does not shatter the public order or threaten to do so. "Vulgar language, however distasteful or offensive to one's sensibilities, does not evolve into a crime because people standing nearby stop, look, and listen. The State's concern becomes dominant only when a breach of the peace is provoked by the language." (Internal quotation marks omitted.) *Bradshaw*, 116 Ill. App. 3d at 422.

¶ 68    Indeed, vulgarity is protected speech unless it disturbs the neighbors' sleep at two in the morning (*People v. Albert*, 243 Ill. App. 3d 23, 27 (1993)) or takes the form of fighting

words, *i.e.*, "personally abusive epithets which, when addressed to an ordinary citizen, as a matter of common knowledge, are inherently likely to provoke violent reaction." (Internal quotation marks omitted.) *Allen*, 288 Ill. App. 3d at 507. Judging by the 911 caller's dispassionate report that defendant was "just acting erratically," Summers lacked "a reasonable, articulable suspicion" that defendant had breached the peace by uttering fighting words. *Luedemann*, 222 Ill. 2d at 549. Defendant, apparently, was an eccentric—that was all. "[T]he commonly held understanding of a breach of the peace has always exempted eccentric or unconventional conduct, no matter how irritable to others." (Internal quotation marks omitted.) *Allen*, 288 Ill. App. 3d at 506.

¶ 69        Seeing no reasonable articulable suspicion of disorderly conduct, I do not even reach the further question of whether a reasonable suspicion of disorderly conduct that is over and done with by the time the police arrive can justify a *Terry* stop. See 4 Wayne R. LaFave, Search and Seizure § 9.2(c) (5th ed. 2012), at 396-97 (arguing that "[t]he *Terry* rule should be expressly limited to investigation of serious offenses" and warning that "[t]he circumstances which might lead an officer to suspect that a person is committing such a crime as *** disorderly conduct are sufficiently diverse and diffuse that their inclusion might mean a large and hard-to-review expansion of coercive authority." (Internal quotation marks omitted.)).

¶ 70                              B. Flight From the Police

¶ 71                              1. *Thomas*

¶ 72        One would think, from the majority's explication of *Thomas*, that all a police officer has to do is dash toward some hapless person, in an "effort to effect an unwarranted investigatory stop," and if the person is timorous enough to run, the police have reasonable suspicion for a *Terry* stop—and, what is more, the reasonable suspicion immediately morphs into

probable cause to arrest the one fleeing for obstructing a police officer. *Thomas*, 198 Ill. 2d at 113.

¶ 73    It is true that the supreme court said in *Thomas*: "Unprovoked flight in the face of a potential encounter with police may raise enough suspicion to justify the ensuing pursuit and investigatory stop" (*id.* at 113), but the critical word here is "may"; behind that word are some important facts in *Thomas* that the majority, in its discussion of the case, overlooks. Those facts are fivefold: (1) the police officer noticed that the defendant was holding a police scanner, which enabled the defendant to monitor police radio transmissions; (2) the police officer previously had arrested the defendant for drug offenses; (3) the police officer had learned of a confidential tip that the defendant had been using a bicycle to deliver narcotics, most often in the evening; (4) the defendant was presently on a bicycle (and holding the police scanner); and (5) it was 11:30 p.m. *Id.* at 106. The supreme court agreed with the appellate court that those five facts were insufficient, in themselves, to arouse reasonable suspicion and that the attempted *Terry* stop was, therefore, unjustified. *Id.* at 110. Nevertheless, when the defendant ran at the approach of the police, ditching his bicycle and his police scanner, the defendant's flight, *combined with those other facts*, aroused reasonable suspicion. See *id.* at 113-14.

¶ 74    It was not that the defendant's flight alone aroused a reasonable suspicion of criminal activity; that would be a caricature of *Thomas*. Rather, the defendant's flight "*credited other information that* [*the police officer*] *possessed* and gave rise to an articulable suspicion that criminal activity was afoot." (Emphasis added and internal quotation marks omitted.) *Id.* at 114.

¶ 75                                     2. *Wardlow*

¶ 76    Admittedly, the Supreme Court said in *Wardlow*: "Headlong flight—whenever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is

- 23 -

certainly suggestive of such." 528 U.S. at 124. In the immediately preceding sentence of *Wardlow*, however, the Supreme Court characterized "nervous, evasive behavior" as "a pertinent *factor* in determining reasonable suspicion." (Emphasis added.) *Id.* Flight is evasive behavior, and, as such, it is a factor in determining reasonable suspicion. See *id.* If flight, by itself, aroused reasonable suspicion, it would not be, as the Supreme Court said, "a pertinent factor"; it would be the one and only all-sufficient consideration. *Id.* But it is not. The majority in *Wardlow*, as the partial concurrence observed, rejected the pat formulation that flight equals reasonable suspicion (*id.* at 126-27 (Stevens, J., concurring in part and dissenting in part, joined by Souter, Ginsburg, and Breyer, JJ.)); "[t]he concept of reasonable suspicion *** is not readily, or even usefully, reduced to a neat set of legal rules, but must be determined by looking to the totality of the circumstances—the whole picture" (Internal quotation marks omitted.) (*id.*) (Stevens, J., concurring in part and dissenting in part, joined by Souter, Ginsburg, and Breyer, JJ.)).

¶ 77 All the facts, all the circumstances—not just flight—have to be taken into account. See *id.* at 124 (majority opinion). Flight has to be evaluated in its factual context, and context can make all the difference. See *id.* For instance, unprovoked flight in an area of heavy narcotics trafficking justified a *Terry* stop: That was the Supreme Court's holding in *Wardlow*. *Id.* at 124-25.

¶ 78 Thus, in *Wardlow*, the Supreme Court of the United States disagreed with the Illinois Supreme Court that "sudden flight in [a high crime] area [did] not create a reasonable suspicion justifying a *Terry* stop." *Id.* at 122. But the Supreme Court of the United States expressed no disagreement at all with our supreme court's position that flight at the approach of the police, *without more*, was insufficient to justify a *Terry* stop (*People v. Wardlow*, 183 Ill. 2d 306, 312 (1998), *rev'd on other grounds sub nom. Illinois v. Wardlow*, 528 U.S. 119 (2000)).

Therefore, absent some contrary indication by our supreme court, that position remains binding law in Illinois. And such has been the understanding of the appellate court—until now. See *Hyland*, 2012 IL App (1st) 110966, ¶ 32 ("It is well settled that flight alone is not sufficient to establish reasonable suspicion that a person has committed, or is about to commit, a crime."); *Harris*, 2011 IL App (1st) 103382, ¶ 12.

¶ 79                              C. A Completed, as Opposed to an Ongoing, Crime

¶ 80           In *Navarette*, the Supreme Court stated that "[e]ven a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.' " *Navarette*, 572 U.S. at ___, 134 S. Ct. at 1690 (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "Afoot" means "in action" or "in progress" (The Merriam-Webster Dictionary 13 (2004)), and there can be no doubt that the Supreme Court used that word by design, because in the next sentence the Supreme Court wrote: "We must therefore determine whether the 911 caller's report of being run off the roadway created reasonable suspicion of an ongoing crime such as drunk driving as opposed to an isolated episode of past recklessness." *Navarette*, 572 U.S. at ___, 134 S. Ct. at 1690. The Supreme Court decided that the reliable tip of having been run off the roadway raised a reasonable suspicion of drunk driving, which was an ongoing crime, and that "[t]he stop was therefore proper." *Id.* at ___, 134 S. Ct. at 1690.

¶ 81           This passage in *Navarette* could easily—and understandably—create the impression that a reliable tip will justify a *Terry* stop only if it arouses a reasonable suspicion of ongoing criminal activity as opposed to a completed crime. See *Lopez*, 2018 IL App (1st) 153331, ¶¶ 24-28. I am not quite convinced, however, that the Supreme Court intended to lay down that categorical rule, considering that in a footnote to the passage, the Supreme Court cited, with no apparent disapproval, its previous decision in *United States v. Hensley*, 469 U.S. 221,

- 25 -

229 (1985). "Because we conclude," the footnote in *Navarette* reads, "that the 911 call created reasonable suspicion of an ongoing crime, we need not address under what circumstances a stop is justified by the need to investigate completed criminal activity." *Navarette*, 572 U.S. at ___, 134 S. Ct. at 1690 n.2. At the cited page of *Hensley*, the Supreme Court had held that, "if police ha[d] a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter[ed] was involved in or [was] wanted in connection with a completed *felony*, then a *Terry* stop [might] be made to investigate that suspicion." (Emphasis added.) *Hensley*, 469 U.S. at 229. But *Hensley* had expressly left for another day the question of "whether *Terry* stops to investigate all past crimes, however serious, [were] permitted." *Id.* In other words, *Hensley* never reached (because it did not have to reach) the territory of nonfelonious offenses: whether a reasonable suspicion that someone had consummated, in the past, an offense less serious than a felony would justify a *Terry* stop of that person. (In this context, probable cause must not be confused with reasonable suspicion: If a police officer sees someone run a red light, it is a past crime as opposed to an ongoing crime, but the police officer has probable cause that the driver committed this petty offense, not just reasonable suspicion.)

¶ 82         Because reckless driving was punishable, under California law, by incarceration for no more than 90 days (Cal. Veh. Code § 23103(c) (West 2011)), it was not a felony. See Black's Law Dictionary (11th ed. 2019) (defining a "felony" as "[a] serious crime usu[ally] punishable by imprisonment for more than one year or by death"). Therefore, unless the Supreme Court in *Navarette* had found "reasonable suspicion of an ongoing crime such as drunk driving as opposed to an isolated episode of past recklessness," the Supreme Court might have had to answer the question left unanswered in *Hensley*: whether the reasonable suspicion of a completed misdemeanor such as reckless driving, committed in the past, justified a *Terry* stop.

See *Navarette*, 572 U.S. at ___, 134 S. Ct. at 1695 n.3 (Scalia, J., dissenting, joined by Ginsburg, Sotomayor, and Kagan, JJ.).

¶ 83 It seems to me, then, that the point of the passage in *Navarette* was not, as the majority in this case suggests, to indicate "the Court's understanding of the seriousness of the circumstances as understood by the police officer who made the stop." *Supra* ¶ 47. The point, rather, was to establish that there was no need to address the unanswered question in *Hensley*.

¶ 84 I need not address the unanswered question in *Hensley*, either. Defendant's suspected trespasses were ongoing; he was in the process of cutting through yards in his continuing attempt to escape the police. Suspected trespassing was " 'afoot.' " *Id.* at ___, 134 S. Ct. at 1690 (majority opinion) (quoting *Terry*, 392 U.S. at 30).

| | |
|---|---|
| **Cite as:** | *People v. Eyler*, 2019 IL App (4th) 170064 |
| **Decision Under Review:** | Appeal from the Circuit Court of Adams County, No. 16-CF-269; the Hon. Scott J. Butler, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Katie Anderson, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Gary L. Farha, State's Attorney, of Quincy (Patrick Delfino, David J. Robinson, and Benjamin M. Sardinas, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |