NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210593-U

NO. 4-21-0593

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 24, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| ELIJAH DAVIS, | ) | No. 21DT27 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Pablo A. Eves, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Knecht and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: If, at 2 a.m. on a Saturday, a police officer in the parking lot of a restaurant is informed by a witness waiting in the drive-through that the driver in the car directly behind her has just vomited out of his car, the police officer has a reasonable, articulable suspicion that the driver is under the influence of alcohol, and a traffic stop to investigate that possibility is reasonable under the fourth amendment (U.S. Const., amend. IV).

¶ 2    After hearing evidence, the Circuit Court of McLean County denied a petition by defendant, Elijah Davis, to rescind the summary suspension of his driver's license. The ground of his petition was that the arresting police officer lacked a reasonable, articulable suspicion of criminal activity and hence his investigatory traffic stop of defendant was unjustified. Given the court's factual findings—to which we defer because they are not against the manifest weight of the evidence—we conclude that the facts available to the police officer at the moment of the traffic

stop would have warranted a person of reasonable caution in the belief that an investigatory traffic stop was appropriate. Therefore, we affirm the judgment.

¶ 3                                            I. BACKGROUND

¶ 4          On January 16, 2021, after defendant's blood-alcohol content was measured at 0.108, the State charged him, by citation, with driving under the influence of alcohol (DUI) (625 ILCS 5/11-501(a)(1), (2) (West 2020)).

¶ 5          The Secretary of State notified defendant that, effective March 3, 2021, defendant's driver's license would be suspended for six months. See *id.* § 11-501.1(e).

¶ 6          Defendant filed a petition to rescind the summary suspension, alleging that the arresting officer, Chad Olson of the police department of Normal, Illinois, lacked a "reasonable[,] articulable suspicion for a lawful stop and/or reasonable grounds to believe that [defendant] was driving or in actual physical control of a motor vehicle upon a public highway of this State while under the influence of alcohol." See *id.* § 2-118.1(b)(2).

¶ 7          In the bench trial on his petition, defendant took the stand in his own behalf. He testified that on Saturday, January 16, 2021, at about 2:18 a.m., he stopped at McDonald's on Main Street and Vernon Avenue in Normal, Illinois. After his order was handed to him from the drive-through window, he started to leave the parking lot when a police car behind him turned on its emergency lights. Defendant stopped and parked his car. At the moment of the stop, defendant was eating French fries and was engaged in a phone conversation on a hands-free device. Olson knocked on the driver's-side window. Defendant finished the phone conversation and rolled down the window. After introducing himself, Olson told defendant that somebody had seen him throwing up. Defendant denied having done so. Olson asked defendant if he had had anything to drink. Defendant testified that he answered in the negative. Olson remarked to defendant that he,

defendant, had his windshield wipers on. "It had been snowing and raining the entirety of that night," defendant testified, "and [it] was [doing so] at the time." When Olson confiscated defendant's driver's license and told him to get out of the car, defendant asked Olson "what was happening because [he] was just getting food." Defendant recounted that Olson "just kept telling me that I was throwing up even though I kept saying I wasn't." In his testimony, defendant denied throwing up in the drive-through of the McDonald's restaurant.

¶ 8          In his testimony, however, defendant admitted he had been drinking that night. On cross-examination, the prosecutor asked him:

> "Q. Did you have anything to drink that night?
>
> A. I did.
>
> Q. But you initially told the officer you didn't?
>
> A. I did."

¶ 9          Defendant's attorney also called Olson, who testified substantially as follows. On January 16, 2021, around 2:18 a.m., he received a call from the dispatcher's office that a hit and run had occurred at the McDonald's on South Main Street in Normal. About the same time, another police officer (who is unnamed in Olson's testimony) received a call that there was a "suspected DUI" at another McDonald's, this one on North Main Street. This other police officer relayed to Olson the following details from the DUI report (or code 55, in police parlance): according to the telephone call to the dispatcher's office, a male driving a car of a certain description, with the license plate "IHOOP," had vomited in the drive-through of the McDonald's on North Main Street.

¶ 10          Olson went to the McDonald's on South Main Street, intending to investigate the hit and run. Upon arriving there, however, he did not see the vehicle that had called in the hit and run. He did "a loop around" the McDonald's building, and then he saw a woman trying to flag him

down. "She was in the drive[-]through," Olson testified, "and she was motioning to me like behind me, so I rolled my window and she said that[] she was calling about the male behind."

¶ 11	Originally, Olson testified that the woman in the drive-through "rolled her window down and *** said that the person behind her was throwing up outside the vehicle." Later, Olson testified that the woman "told the dispatcher about the throwing up, not me." The woman told Olson merely that "she was calling about the male behind." At first, Olson "thought that she was the caller for the hit and run." But then, when Olson "flipped around and [saw] the vehicle behind her, [he] saw the IHOOP license plate." At that point, Olson "put two and two together." He surmised that, evidently, it was this McDonald's on South Main Street where the code 55 was located, not the McDonald's on North Main Street.

¶ 12	The prosecutor asked Olson:

"Q. Now based on your experience as a police officer and your common sense, when you're presented with this information of an individual at McDonald's at two in the morning throwing up outside their vehicle, what does your common sense and your experience, what does that lead you to believe in that situation?

A. Um, usually it's an impaired driver.

Q. Is that something that happens regularly?

A. Yes.

Q. *** Is that a situation that you have seen as part of your experience as a Normal police officer?

A. Yes."

¶ 13	When defendant exited the drive-through, Olson turned on his emergency lights and stopped him in the McDonald's parking lot. Before speaking with defendant, Olson noticed a

couple of peculiarities. For one thing, defendant's windshield wipers were going at a rather brisk pace even though "it wasn't snowing or raining at the moment." Also, Olson had to "knock on the window a couple times to get [defendant's] attention."

¶ 14 Eventually, defendant rolled down his driver's-side window. As Olson spoke with defendant through the open window, he noticed that defendant "was slurring his words" and that defendant's "eyes were bloodshot and glassy." He explained to defendant that he was "checking on [defendant's] well-being" because "somebody [had seen] him throwing up outside the car." Defendant denied having done so. Nevertheless, Olson saw the need for a field sobriety test. He asked defendant to get out of the car.

¶ 15 Because the ground was snowy and wet, the conditions were poor for conducting a field sobriety test outdoors. Olson gave defendant the option of undergoing a field sobriety test at the scene or at the police station. As Olson put it in his testimony, defendant "kind of made a motion with his arms up saying that he was compliant with everything." So, Olson took defendant to the DUI processing room of the Normal police department, where he administered a field sobriety test, which defendant failed.

¶ 16 After hearing the foregoing testimony and taking the matter under advisement, the circuit court held that the traffic stop "was proper under the community caretaking doctrine." "Community caretaking," the court explained, "is an exception to the warrant requirement that allows a seizure where law enforcement is performing some *** functions [other than] investigating a crime[ ] and [where] the search or seizure is reasonable because it was necessary to protect the safety of the general public."

¶ 17 In determining whether the police officer was performing a function other than investigating a crime, the circuit court deemed itself obligated to "view[ ] the officer's actions

objectively." While acknowledging that Olson "believed it was a suspected DUI," the court held that "constitutional reasonableness does not depend on the actual motivations of the individual officer involved." Olson's "statement to the defendant at the time of first contact," the court noted, "was to check on him based on the call to see if he was medically hurt." Therefore, the court concluded that, from an objective point of view—regardless of Olson's simultaneous subjective suspicion that defendant was intoxicated—Olson was performing a function other than investigating a crime, namely, checking on defendant's medical well-being.

¶ 18　　　　Second, the circuit court regarded the traffic stop as "reasonable because it was undertaken to protect public safety." "The public has a substantial interest," the court reasoned, "in ensuring that police investigate [a] motorist who may become ill, for whatever reason, while driving." A motorist who "may be intoxicated or suffering from some sudden illness" might pose a hazard on the road.

¶ 19　　　　Therefore, the circuit court concluded that, "[u]nder these circumstances in this case, it was within Officer Olson's authority in responding to the call to determine whether assistance was needed." The court held, "The objective facts of record fall within the community caretaking exception to the Fourth Amendment[,] and the seizure of the defendant was reasonable." By "seizure," in this context, the court meant the traffic stop. The court further reasoned that, during Olson's subsequent interaction with defendant, probable cause developed to arrest defendant for DUI. Accordingly, the court denied the petition to rescind the summary suspension of defendant's driver license.

¶ 20　　　　This appeal followed.

¶ 21　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 22 Defendant claims that, "from the objective and subjective facts of this case," the traffic stop at McDonald's was purely the investigation of a crime, not community caretaking. See *People v. McDonough*, 239 Ill. 2d 260, 272 (2010) (holding that, to find the community caretaking doctrine to be applicable, a court must find two general criteria: (1) "law enforcement officers [were] performing some function other than the investigation of a crime," and (2) "the search or seizure [was] reasonable because it was undertaken to protect the safety of the general public"). Defendant argues that Olson's "alleged concerns would have dissipated at the time he saw [defendant's] vehicle appropriately navigate the [drive-through], likely getting and paying for his food, [and] exit the drive-thru line with a fully operational vehicle, absent any additional observations of impairment, visible signs of vomit on the ground, or evidence of vehicular malfunction."

¶ 23 Also, defendant observes that "there is some internal inconsistency in Officer Olson's testimony." At first, Olson testified that the woman in drive-through line told him "the person behind her was throwing up outside the vehicle." Later, Olson testified the woman merely told him that "she was calling about the male behind."

¶ 24 In rescission appeals, we defer to the circuit court's findings of fact except insomuch as the findings are against the manifest weight of the evidence, but we "review[ ] *de novo*" "the ultimate legal ruling regarding rescission." *People v. Relwani*, 2019 IL 123385, ¶ 18. A credibility assessment is a factual finding, which we will reverse only if it is against the manifest weight of the evidence. *People v. Brantley*, 2016 IL App (5th) 150177, ¶ 15. Evidently, the circuit court found Olson to be credible. That credibility assessment is not against the manifest weight of the evidence. A reasonable trier of fact could believe Olson. Even if the woman did not tell Olson explicitly that the male in the car behind her is the one who threw up in the drive-through, she

intended to convey that message. Olson could be deemed honest for the very reason that he took care to clarify his earlier testimony.

¶ 25    Granted, Olson's subjective honesty does not establish the objective need to check on defendant's well-being. See *McDonough*, 239 Ill. 2d at 272 (holding that, in determining whether the community caretaker exception is applicable, "a court views the [police] officer's actions objectively"). But we need not decide whether, from an objective point of view, defendant's successful navigation of the drive-through should have dissipated any concern over whether he was in need of medical assistance. We may affirm the circuit court's judgment on any basis that may be found in the record. Deferring to the court's findings of fact, we conclude *de novo* that the traffic stop was justified by a reasonable, articulable suspicion of DUI. See *id*.

¶ 26    The supreme court has held:

"[A] police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to, commit a crime. [Citations.]

The investigatory stop must be justified at its inception. [Citation.] [T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. [Citation.] The officer's suspicion must amount to more than an inarticulate hunch [citations], but need not rise to the level of suspicion required for probable cause [citation]. In judging the police officer's conduct, we apply an objective standard: would the facts available to the officer at the moment of the seizure *** warrant a man of reasonable caution in the belief that the action taken was

appropriate? [Citations.]" (Internal quotation marks omitted.) *People v. Close*, 238 Ill. 2d 497, 505 (2010).

Having been informed, at 2 a.m. on a Saturday, that a driver had just then stuck his head out of his car and thrown up, any person of reasonable caution would suspect, on the basis of more than a hunch, that the driver had consumed too much liquor. Granted, if a driver vomits out of his car, intoxication is not the only possibility. Alternatively, he could have the flu or food poisoning. Normally, however, someone who is sick to his stomach would not be in a drive-through ordering food. Besides, a person's behavior, though "*potentially* innocent," can raise reasonable suspicion, justifying a brief investigatory stop to "resolve the ambiguity." (Emphasis in original and internal quotation marks omitted.) *People v. Lozano*, 2022 IL App (1st) 182170, ¶ 35.

¶ 27    Defendant points out that if an investigatory stop is based on a phoned-in tip, the tip has to "bear some indicia of reliability." *People v. Ledesma*, 206 Ill. 2d 571, 583 (2003). He argues that the tip from the woman in the drive-through lacked sufficient indicia of reliability. In addition to citing *Ledesma*, defendant cites *People v. Eyler*, 2019 IL App (4th) 170064, ¶ 30, for the various factors a court should consider in assessing the reliability of a telephonic tip. *Ledesma* and *Eyler* are inapplicable, however, because the tip was not merely phoned in. The woman was face to face with Olson in the McDonald's drive-through, and she pointed at defendant, in the car directly behind her, saying he was the one she had called about. What is more, defendant's license plate said "IHOOP," and the woman had reported to the dispatcher's office that the male who had vomited in the drive-through was driving a car the license plate of which said "IHOOP." Even though, as Olson admitted, he did not see the vomit, his investigatory stop was reasonable and appropriate in the circumstances.

¶ 28                    III. CONCLUSION

¶ 29        For the foregoing reasons, we affirm the circuit court's judgment.

¶ 30        Affirmed.