NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230285-U

NO. 4-23-0285

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 2, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Boone County |
| RICHARD WIGGINTON, | ) | No. 21CM81 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Ryan A. Swift, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Knecht and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The appellate court affirmed, concluding none of the arguments raised by
defendant demonstrate error.

¶ 2    Following a bench trial, defendant Richard Wigginton was convicted of criminal
trespass to property (720 ILCS 5/21-3(a)(3) (West 2020)), disorderly conduct (*id.* § 26-1(a)(1)),
and two counts of resisting a police officer (*id.* § 31-1(a)). In this direct appeal, he presents
numerous contentions of error. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Following an incident at a United States post office in Belvidere, Illinois, the State
charged defendant in an eight-count information with three counts of resisting a police officer (*id.*
§ 31-1(a)), two counts of criminal trespass to property (*id.* §§ 21-3(a)(1), (a)(3)), and three counts
of disorderly conduct (*id.* § 26-1(a)(1)). Two of the counts for resisting arrest relied on defendant
pulling away from officers after they informed him he was under arrest, and the third was premised

on the allegation that defendant "tensed his arms into a straight position when told by police to place his hands behind his back." One count of criminal trespass alleged that defendant failed to leave the post office building after one employee asked him to do so, and another alleged defendant refused to leave the post office grounds after being directed to do so by officers. Two of the disorderly conduct charges alleged defendant acted in a manner that served to alarm and provoke a breach of the peace based on his communications with postal employee Stephanie Johnson, while the third charge for disorderly conduct alleged his conduct provoked a breach of the peace by alarming and disturbing the postal workers present and disrupting their interactions with customers.

¶ 5                                   A. Pretrial

¶ 6        Although defendant faced only misdemeanor charges, the matter was litigated in the trial court for nearly two years. The main reason behind this exertion of resources was defendant's repeated assertion that the trial court lacked jurisdiction because the offenses occurred on federal property. The court spent approximately a year and a half resolving this issue by ruling on numerous pretrial motions. This included a motion to dismiss, a motion for clarification of the ruling on the motion to dismiss, two motions to reconsider the denial of the motion to dismiss, and various other hearings, including a hearing to quash the subpoenas issued by defendant for witnesses to appear at the hearings on the motions to reconsider. Defendant's initial motion to dismiss was a 20-count pleading, and the crux of his argument was that, pursuant to the Code of Federal Regulations (39 C.F.R. § 232.1(p) (2010)), there was no concurrent jurisdiction for the State of Illinois to prosecute him. The trial court disagreed, citing a different subsection of the code and additional caselaw analyzing jurisdiction on federal land and buildings.

¶ 7        Regarding the quashed subpoenas, the Office of Counsel for the United States

Postal Inspection Service responded to defendant's submission of two subpoenas and a request for documents from two postal employees. The letter was addressed to defendant and explained that the individuals subpoenaed would not be complying due to the fact the postal service was not a party to the criminal case and that defendant failed to comply with the requirements set forth in the Code of Federal Regulations. The letter indicated at the bottom that copies were sent to the trial court and the prosecutor, and nothing in the record indicates that this inference is incorrect.

¶ 8        Defendant also attempted to remove the matter to federal court more than once, and those attempts were rejected by the district court. In denying removal and remanding the matter back to the state court, the district court also found that the state court had jurisdiction to preside over defendant's prosecution. Defendant additionally filed a writ of prohibition with the Illinois Supreme Court and an interlocutory appeal that was dismissed for a failure to follow Illinois Supreme Court rules.

¶ 9        Defendant proceeded *pro se* for the majority of the pretrial proceedings. During a December 2022 court hearing, the trial court turned to the matter of pending motions *in limine*. Defendant immediately claimed that the court could not proceed in the case because of a pending appeal to the Seventh Circuit Court of Appeals from the denial of his attempt to remove the matter to federal court. Additionally, he had once again attempted to remove the case to the district court. The trial court noted that there had not been a stay of the proceedings and, unless instructed otherwise, it would move forward with the case. Defendant then asked for a continuance to obtain counsel. The court denied the request, noting that defendant had waited approximately a year and a half before attempting to hire counsel and repeatedly confirmed his desire to proceed *pro se*; the court further noted that defendant remained free to obtain counsel prior to trial. The trial date had been set for four months and the motions *in limine* had been on file for a month. Moreover, the

court believed that the continuance request was a delay tactic. The court then ruled on the various motions *in limine* over defendant's objections, observing that the rulings could be revisited at a later time.

¶ 10　　At a subsequent hearing, retained counsel appeared for defendant and requested that the trial date be stricken and rescheduled to a later date due to scheduling conflicts in other cases he was to appear in. The trial court indicated that it understood the predicament that counsel was in having entered the case two weeks before trial, but due to the fact that the case had been pending for two years and was relatively straightforward, the court was not inclined to move the trial date. The court set a status date and kept the trial date.

¶ 11　　At the status hearing, defense counsel stated he had reviewed discovery and related documents. The majority of the documents were pleadings filed by defendant. After discussing counsel's other obligations, it was determined that the trial date could remain set.

¶ 12　　　　　　　　　　　　B. Bench Trial

¶ 13　　The case was subsequently called for a bench trial, and defense counsel answered ready to proceed. The theory of the State's case was that defendant preplanned this incident in an effort to record a "first amendment audit" (see U.S. Const., amend. I) and post that content to the Internet. The testimony and evidence presented were as follows.

¶ 14　　　　　　　　　　　　1. *Annette Turk*

¶ 15　　Annette Turk has worked for the postal service for 36 years and was working at the Belvidere post office on the day of the incident. Turk waited on defendant's wife Beverly Wigginton when she dropped off a prepaid box. Turk reminded Beverly, who was not masked, of the mask policy, imposed as a result of the COVID-19 pandemic. Turk explained that Beverly said she did not want to leave the premises after she had conducted her business but instead wanted to

speak to a supervisor. Turk was familiar with Beverly because she had a post office box (P.O. box) at the post office where Turk worked. Beverly had made several prior complaints about having to wear a mask in the post office. Initially, Beverly was accompanied only by her daughter, but the daughter later left and returned with defendant.

¶ 16 Defendant entered the post office and started recording with his cell phone. Turk explained that there is an island between the entry doors and the counter. Customers form a line on one side of the island, where they wait to approach the counter. Defendant approached the island and began recording the counter and pay station Turk was behind. She asked defendant to put the phone down because she was trained to not allow anyone to record near the counter in order to protect customers' private payment information. Defendant was approaching customers inside the post office and telling them that they did not have to wear a mask. Defendant stayed in public areas of the post office and did not physically obstruct anyone's movements.

¶ 17 At some point, defendant came closer to the counter and told Turk that the postal employees were "going to get educated." Turk did not know what defendant meant by that statement. Defendant seemed worked up and the situation made Turk feel threatened and uncomfortable. Turk described the atmosphere inside the post office as one of agitation. Defendant's conduct disrupted Turk's interactions with customers. Turk told defendant and his wife that they could wait outside and reiterated the policy regarding masking in the post office and the prohibition of recording transactions of other customers.

¶ 18 Turk called for her supervisor. The supervisor explained the masking and recording policy to defendant and Beverly and requested that the couple leave the property if they were done with their business. Defendant and Beverly did not leave the property. Following the interaction with the supervisor, defendant walked around the post office while recording.

¶ 19                              2. *Stephanie Johnson*

¶ 20          Stephanie Johnson was a customer service supervisor at the Belvidere post office. Turk came to Johnson's office on the day of the incident and stated she needed help with an individual. Johnson walked behind the counter, where she saw defendant and his wife in the post office. He was recording, and both he and Beverly were being "loud." Johnson approached defendant and advised him that recording was not allowed and that he was required to wear a mask. Defendant said that he would not wear a mask and was being "loud," "pushy," and "confrontational." There were signs in the lobby noting the post office policy for customers to wear masks. When Johnson said she was going to call the police, she felt threatened when defendant responded by saying, " 'Go ahead. You're about to get educated.' " She asked defendant and Beverly to leave if they did not have further business to conduct at the post office.

¶ 21          On cross-examination, Johnson admitted that at the time of the incident, she believed the post office policy prohibited recording in the building but was later clarified that recording was only prohibited near the counter to protect financial transactions.

¶ 22                              3. *Kaila Osborne*

¶ 23          Kaila Osborne was also a customer service supervisor for the Belvidere post office. Johnson came to her in the back area of the post office and asked her to come to the front following a negative reaction from defendant when he was asked to wear a mask. She observed defendant walking around the post office recording "everybody" and narrating the video. Defendant seemed "aggravated" and appeared to be "trying to make a point." She asked defendant to leave and told him she was going to call the police. He appeared to become excited when she said the police would be called. She waited for the police to arrive while defendant continued to walk around the post office recording. She felt nervous when defendant came closer to her to record one of the

notices on the wall. When the police arrived, an officer asked if she wanted defendant removed and she said "yes." Officers took defendant outside, and she returned to work.

¶ 24                                             4. *Beverly Wigginton*

¶ 25            Beverly drove to the post office with defendant and their daughter on the day of the incident. She was familiar with the video defendant recorded inside the post office and admitted that the video captured her telling defendant to be quiet. She said the comment was in response to the supervisor and defendant speaking over her, not because defendant was being loud. She also acknowledged a postal employee made a request for them to essentially wait outside because they did not have masks on. Beverly also asked defendant at one point, " 'Is she calling or are we just wasting our time?' "

¶ 26                                             5. *T.W.*

¶ 27            T.W. is the minor child of defendant and Beverly, and she entered the post office with Beverly. After Beverly was confronted about not wearing a mask, T.W. went outside to retrieve defendant so he could record the encounter. Once the police were called, defendant advised T.W. not to speak to the police and that he would hand her his phone if "anything happened." During his arrest, defendant reached out and handed her his phone. From her observations, defendant did not resist arrest and complied with what officers were telling him. She denied that they were there to conduct a first amendment audit and instead were there to conduct business. The prosecution confronted T.W. with her own signed statement that stated defendant entered the post office to conduct a "first amendment audit." She continued to deny the intent was to conduct such an audit.

¶ 28                                             6. *K.C. Brox*

¶ 29            Detective K.C. Brox was an officer with the Belvidere Police Department at the

time of the incident. While patrolling in full uniform, she received a call about a disorderly individual at the post office who was refusing to leave. When she entered the post office, she saw defendant recording and immediately told him to get out of the post office. He did not leave, and she asked a postal employee standing nearby if she wanted defendant "trespassed." The employee responded in the affirmative, and Brox again told defendant to leave. Instead, he began arguing with her. Brox was able to get defendant to leave the lobby, but he continued to argue with her directly outside the doors of the post office. She informed him that he needed to leave the property entirely. Instead of leaving, he requested the officers' badge numbers, which Brox gave, and additional information. When he still did not leave, she informed him he was "going to jail." She walked around to his left side and grabbed his left wrist while another officer grabbed his right hand. Defendant tensed up to prevent his left arm from being placed behind his back, and his right arm broke free from the other officer. Brox maintained control of defendant's left arm while he pulled against her. Defendant ended up on the ground but had his arms in a position that prevented them from being placed behind his back. Eventually, he complied and put his hands behind his back.

¶ 30    Brox had reviewed the video from both post office surveillance cameras and defendant's cell phone. She claimed defendant had edited the video from his cell phone to remove the portion of the interaction from the time when Brox told defendant he was under arrest to the time they ended up on the ground. She further asserted she had seen the unedited version of the recording taken from defendant's cellphone posted on YouTube.

¶ 31    On cross-examination, Brox admitted that she did not specifically tell defendant he was under arrest but instead said, "You're not leaving," while making physical contact with defendant. She had warned him that if he did not leave the property, he would be arrested. Brox

did not know why defendant went to the ground, as she did not force him to the ground.

¶ 32                                    7. *Ethan Berillo*

¶ 33          Detective Ethan Berillo worked for the Belvidere Police Department at the time of the incident. He was in the area when a call for a police presence at the post office went out, so he went to the scene to assist. When he arrived, Brox was already inside the post office talking to two people. Brox and defendant were on their way out while Berillo was walking in. Berillo was heading into the post office to talk to the employees when he heard arguing behind him and turned back around. He saw Brox and officer Zachary Reese holding the arms of defendant while attempting to arrest him. Defendant then broke his right arm free from Reese. Defendant was holding a cell phone in his right hand, and Berillo went to secure defendant's right arm while he was handing the phone to T.W.

¶ 34                                    8. *Defendant*

¶ 35          Defendant testified that he went to the post office with Beverly and T.W. to check a P.O. box and mail a package. He waited in the car until T.W. came and asked him to come inside. There was a dispute over Beverly and T.W. not wearing masks, and he began recording because it was his right to do so. Because he believed the post office was a public space, he declined to stop recording when a postal employee requested that he do so. He did not have any conversations with other customers in the post office. He did not intend any of his comments to be threatening. Once Johnson said she was calling the police, he decided to stay and wait for the police.

¶ 36          Brox entered the post office and immediately told defendant to leave. She appeared agitated and was "not clear in her directives." Once outside, Brox never told defendant he was under arrest. Brox told defendant he was going to jail if he did not leave the property. Once Brox told defendant he was going to jail, he reached out to give his phone to T.W. and then braced

himself for the fall to the ground when the officers pushed him down. He had no idea what to do because the officers did not give him any directives. Once he was on the ground, he put his hands behind his back and did not resist arrest.

¶ 37    On cross-examination, defendant admitted that Brox told him multiple times that he needed to leave the property. Defendant asked for Brox's badge number, which she supplied, and she informed him there would be a report, and he then moved back towards the entrance of the post office to get information from Berillo.

¶ 38                              9. *Video Evidence*

¶ 39    Through the foundational testimony of Daniel Rodriguez, a physical security specialist with the United States Postal Inspection Service, and the deputy chief of the Belvidere Police Department, Matthew Wallace, the State introduced surveillance video of the incident from inside the post office. The recording did not have audio. The video showed defendant's wife and daughter entering the post office to mail a package. They approached the counter and conversed with the postal employee. After the conversation, they both stepped away from the counter, and the daughter went outside. The daughter returned with defendant, who immediately began recording inside the post office with his cell phone. Defendant initially waited in line to return to the counter but then began walking around the post office while recording. Just before the next customer in line reached the counter, defendant's wife engaged the employee in conversation, at which time defendant approached the counter and recorded the employee while she began waiting on the next customer in line. Defendant and the employee then began talking while the customer waited at the counter. Defendant remained behind the customer while continuing to record and then began walking around the post office. A postal employee came out from behind the counter to talk to defendant, and he approached her with his daughter behind him while he continued to

record on his phone. Following the conversation, the employee can be seen making a phone call while defendant continued to walk around the post office while recording. Brox walked into the post office in full uniform and met with defendant and the postal employee. Once outside, a brief struggle could be seen, and defendant was placed on the ground.

¶ 40    Another portion of video entered into evidence shows a singular view from one post office camera. The portion of video shows the interaction with police inside the post office and the subsequent struggle outside the post office. Defendant can be seen moving his arms and pulling away from an officer.

¶ 41    Video from defendant's cell phone was also entered into evidence. Approximately the first 40 seconds of the video shows another customer at the counter completing a transaction with a postal employee before another postal employee behind the counter informed defendant that masks were required in the building and asked that he stop recording. While walking behind another customer waiting in line, defendant responded, "Sorry ugh—not gonna happen." After walking around the post office recording, defendant engaged in another conversation regarding the policy of masks inside the building with a postal employee behind the counter while another employee waited on a customer. After a back-and-forth, the employee stated she was going to call the police. Defendant told the employee to do whatever she felt necessary and that if she wanted to "get educated today you'll get educated today." After the employee walked away, defendant continued to record a customer completing a transaction at the counter before he walked around the post office again.

¶ 42    Defendant and his wife walked back to the P.O. boxes, where the wife asked defendant, "Is she calling or are we just wasting our time," presumably referring to whether the employee was calling the police. Defendant then continued to walk around the post office

recording before again talking to Johnson about recording in the building and that she was calling the police. Following that conversation, a customer walked into the post office with a mask on and defendant exclaimed, "Ma'am it's a policy, it's not a law," presumably talking to the masked woman about abiding by the post office policy of masking inside the building. Defendant went back towards the P.O. boxes with his daughter while waiting for police to arrive and told her, "If something happens, I will give you the phone." Defendant went back toward the counter area and again engaged Johnson, arguing that they could no longer force individuals to wear masks inside the building.

¶ 43      During this conversation, Brox entered the building and immediately told defendant to "get out." Brox asked Johnson if she wanted defendant "trespassed," and Johnson responded in the affirmative. Defendant proceeded to argue with Brox about the building being a public place and stated that he was being orderly. Brox told defendant he would be arrested if he did not leave the property. Eventually, defendant walked outside the doors of the post office before turning around to continue talking to Brox. She informed him again that he was "trespassed" and that he needed to leave the property "now." Defendant then asked for her badge number, which she gave, and she also informed him that there would be a report. She again told him to "go." Defendant then took a step toward Brox while saying "no." She physically restrained him from moving towards the doors of the post office and again informed him that she would remove him from the property if he did not leave. Defendant continued to argue with Brox while she told him to "get out of here now." Defendant did not leave. Brox then informed him, "This is your last chance." Defendant again moved towards the entrance of the post office, and Brox stated, "Ok let's go, you're going to jail." Defendant immediately said to "wait" and that he was "leaving." Brox stated that he was not leaving, and the video ends.

¶ 44                                    10. *Trial Court's Order*

¶ 45          The trial court found defendant guilty of counts I (resisting arrest/Brox), II (resisting arrest/Reese), V (trespass to property), and VIII (disorderly conduct). The court imposed a sentence of 10 days in the county jail with day-for-day credit, plus credit for 1 day served in pretrial detention. Defendant did not file a posttrial motion.

¶ 46          This appeal followed.

¶ 47                                    II. ANALYSIS

¶ 48          On appeal defendant raises numerous contentions of error, which we address below.

¶ 49                                    A. Jurisdiction

¶ 50          One of defendant's main contentions on appeal concerns whether the court below had either subject matter or personal jurisdiction. The crux of his argument is that the post office where the incident at issue took place was under the exclusive jurisdiction of the federal government and that the case therefore was not properly prosecuted in state court. Intertwined within this argument are the contentions that the trial court failed to follow precedent in coming to its conclusion, that venue was improper, and that the court erred in barring defendant from arguing defects in jurisdiction at trial. We find that these arguments are all resolved by a review of subject-matter jurisdiction, which we review *de novo*. See *People v. Abdullah*, 2019 IL 123492, ¶ 18. To the extent that we engage in statutory construction, our review remains *de novo*. *People v. Taylor*, 2023 IL 128316, ¶ 45.

¶ 51          The authority of the federal government to acquire land is set forth in the United States Constitution and is well established. U.S. Const., art. I, § 8, cl. 17; *Paul v. United States*, 371 U.S. 245, 264 (1963). However, the fact that land is owned by the federal government within a state does not equate to exclusive federal jurisdiction over that land. *United States v. Davis*, 726

F.3d 357, 363-64 (2d Cir. 2013). Relevant to the jurisdictional question in this appeal, since 1940, it has been "conclusively presumed" that the federal government has not accepted jurisdiction over any land it has purchased absent a notice of acceptance filed by the pertinent department head with the governor of the state or as otherwise set forth by state law. 40 U.S.C § 3112 (2020).

¶ 52    The land on which the Belvidere post office resides was purchased by the federal government in 1996, implicating the "conclusive presumption" against exclusive federal jurisdiction. In response, defendant did not provide any documentation that comported with the requirements of section 3112 of the United States Code, nor did he point to any other method by which the federal government obtained exclusive jurisdiction. Instead, he points to a section of the United States Code that provides:

> "Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building." 18 U.S.C. § 7(3) (2018).

However, as has been pointed out in both the trial court and the district court, nothing in this provision mandates exclusive federal jurisdiction over properties such as the Belvidere post office.

¶ 53    Defendant also argues that section 410 (39 U.S.C. § 410 (2018)), which describes the applicability of other laws to the "powers of the Postal Service," results in the inescapable conclusion that the "conclusive presumption" against exclusive federal jurisdiction does not apply. We remain unpersuaded. Our review of section 410 reveals a legislative design to exclude the actions of the postal service in conducting its operations from the scope of judicial review and scrutiny under the Administrative Procedure Act (5 U.S.C. § 553 (2018)), among others.

Essentially, Congress was granting the postal service a waiver in this provision from federal laws it found could be overly onerous to its operations. A reading of the section does not reveal an intent to exclude the postal service's property procurement from the framework for jurisdiction set forth in section 3112 (40 U.S.C § 3112 (2018)). Section 410 serves to set forth the "powers of the Postal Service," not the jurisdiction of the federal government. Accordingly, section 410 does not impact the conclusive presumption against exclusive jurisdiction of the federal government.

¶ 54        Defendant also points to section 232.1(p)(1) of the Code of Federal Regulations (39 C.F.R. § 232.1(p)(1) (2010)), which controls conduct on postal property. Subsection (p), titled "Penalties and other law," provides:

> "(1) Alleged violations of these rules and regulations are heard, and the penalties prescribed herein are imposed, either in a Federal district court or by a Federal magistrate in accordance with applicable court rules. Questions regarding such rules should be directed to the regional counsel for the region involved.

> (2) Whoever shall be found guilty of violating the rules and regulations in this section while on property under the charge and control of the Postal Service is subject to a fine as provided in 18 U.S.C. 3571 or imprisonment of not more than 30 days, or both. Nothing contained in these rules and regulations shall be construed to abrogate any other Federal laws or regulations or any State and local laws and regulations applicable to any area in which the property is situated." *Id.* § 232.1(p)(1), (p)(2).

¶ 55        Defendant focuses on the first section to the exclusion of the second. When considering the plain language of the regulation, subsection 2 plainly contemplates concurrent jurisdiction for offenses occurring within a post office where exclusive jurisdiction has not been

reserved. Such an interpretation becomes even more cogent when placed in the context of the United States Code relating to federal jurisdiction. See 40 U.S.C § 3112 (2018).

¶ 56        Within the same section, defendant also directs our attention to subsection (q), titled "Enforcement," which provides:

> "(1) Members of the U.S. Postal Service security force shall exercise the powers provided by 18 U.S.C. 3061(c)(2) and shall be responsible for enforcing the regulations in this section in a manner that will protect Postal Service property and persons thereon.
>
> (2) Local postmasters and installation heads may, pursuant to 40 U.S.C. 1315(d)(3) and with the approval of the chief postal inspector or his designee, enter into agreements with State and local enforcement agencies to insure that these rules and regulations are enforced in a manner that will protect Postal Service property."
>
> 39 C.F.R. § 232.1(q)(1), (2) (2010).

Defendant argues that these sections provide that only the security force of the postal service could enforce the provisions of this section and an intergovernmental agreement or memorandum of understanding was required before local law enforcement could enter the post office and enforce state law. This argument is without merit. Similar to defendant's interpretation of subsection (p)(1), defendant's argument on this section ignores the express nonabrogation clause contained in subsection (p)(2). Local law enforcement was enforcing state law, not the provisions of the Code of Federal Regulations, and nothing in subsection (q)(2) mandates the existence of an intergovernmental agreement or memorandum of understanding to do so.

¶ 57        Our analysis leads us to conclude that the Belvidere post office is not a federal enclave and that exclusive federal jurisdiction does not lie. This eviscerates defendant's arguments

relating to personal jurisdiction, the application of the federal Assimilative Crimes Act (18 U.S.C § 13 (2018)), that venue was improper in the Boone County circuit court, and that the trial court erred in granting the State's motion *in limine* precluding him from arguing jurisdiction at trial.

¶ 58        Accordingly, the circuit court of Boone County had both subject matter and personal jurisdiction and venue was proper.

¶ 59                                    B. Forfeited Claims

¶ 60        As noted above, defendant failed to file a posttrial motion to preserve his claims of error on appeal. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Further, defendant does not invoke plain error. See *People v. Hillier*, 237 Ill. 2d 539, 549 (2010) (finding that when a defendant forfeits review of his claims and does not argue plain error, a reviewing court should not consider the merits of those issues).

¶ 61        The State does not specifically argue forfeiture based on these procedural missteps but claims in multiple instances defendant has forfeited claims based on a failure to sufficiently argue certain claims of error and support those claims with authority. A review of defendant's briefing in this court reveals numerous arguments that we can promptly dispense with.

¶ 62        First, throughout his briefing, defendant makes claims that are merely a sentence or paragraph long. In addition to their brevity, these arguments are unsupported by citation to the record or authority, *i.e.*, among others, (1) as-applied challenges and facial challenges alleging the charges are unconstitutional; (2) the claim that Brox's "personal partner" was not excluded from the courtroom during the trial and communicated with her about witness testimony; and (3) claims that his rights generally under the fourth, ninth, and fourteenth amendments (U.S. Const., amends. IV, IX, XIV) were violated. These arguments have been forfeited for failing to properly raise them posttrial, failing to argue plain error, failing to argue the constitutional exception to forfeiture, and

failing to present a coherent argument with citation to the record or authority on appeal. We therefore do not address them.

¶ 63   Second, defendant claims that the State committed discovery violations pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), claiming it failed to produce the body camera video of the officers or "radio body recordings" involved in the incident. Not only was this claim forfeited, but a review of the record shows it lacks merit.

> "To succeed on a *Brady* violation claim, a defendant must establish '(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment.' " *People v. Montanez*, 2023 IL 128740, ¶ 82 (quoting *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008)).

The State offered multiple opportunities for defendant to view the evidence at issue, and he fails to argue how that audio or video recording would differ from the other evidence in the record or how it would be exculpatory.

¶ 64   Third, defendant claims that a letter sent to the chambers of the presiding judge in this case supports a claim of *ex parte* communications. This claim is also forfeited. Furthermore, it is without merit, as the communication was addressed to defendant but included both the judge and the State as recipients. It was a communication to the court and the parties, not an *ex parte* communication to the court.

¶ 65   Fourth, defendant contends that the trial court erred in quashing his subpoenas issued to witnesses to testify at a hearing on his motion to reconsider the denial of his motion to dismiss based on jurisdictional defects. Not only was this claim forfeited, but the court

appropriately quashed the subpoenas. "The purpose of a motion to reconsider is to bring to the court's attention newly discovered evidence that was not available at the time of the original hearing, changes in existing law, or errors in the court's application of the law." *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 36. The testimony of these individuals would not have impacted a decision of the trial court here made as a matter of law, not evidence.

¶ 66 Fifth, defendant's claim that the protective order entered by the trial court to prevent public dissemination of evidence in the case thereby tainting a jury pool in a small rural community constituted error is twice forfeited. Defendant fails to present a coherent argument on this point in his briefing and also fails to cite relevant authority. See *Bartlow v. Costigan*, 2014 IL 115152, ¶ 52 (noting an argument that is merely listed is not argued as contemplated in Illinois Supreme Court Rule 341(h) (eff. Oct. 1, 2020) and that arguments shall be cohesive and clearly defined with pertinent authority cited).

¶ 67 Sixth, defendant claims his right against self-incrimination was violated during the hearing on his motion to dismiss. Defendant does not explain how this right was violated at a time when, having chosen to proceed *pro se*, he was arguing his motion to dismiss. A defendant cannot both insist on the right to speak for himself as counsel and also contend that he was compelled to speak. This conclusory argument, lacking citation to authority and a singular citation to the record on appeal, is insufficient to raise a claim of error. See *Bartlow*, 2014 IL 115152, ¶ 52.

¶ 68 Seventh, defendant asserts that count VIII (disorderly conduct) of the amended charging instrument was deficient for failing to comply with section 111-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3 (West 2020)), where it failed to inform him of the victim of his alleged disorderly conduct but rather stated that defendant approached and disrupted the interactions of "postal employees" with patrons of the post office. Defendant never challenged the

amended information in the trial court. See *People v. Carey*, 2018 IL 121371, ¶ 22 (noting that when a charging instrument is challenged for the first time on appeal, we consider " 'whether the defect in the information or indictment prejudiced the defendant in preparing his defense' " (quoting *People v. Thingvold*, 145 Ill. 2d 441, 448 (1991))). Defendant's argument also ignores the fact that it is well-established that disorderly conduct can occur when a defendant's actions threaten another *or* have an impact on the surrounding crowd. *People v. Eyler*, 2019 IL App (4th) 170064, ¶ 22. The language of count VIII clearly follows in the form of the latter version of the offense, and defendant fails to show how the allegations of count VIII prejudiced him in the preparation of his defense.

¶ 69          Eighth, defendant presents a convoluted argument that the trial court erred in granting the State's motions *in limine*. He argues the court erred on the merits and asserts merely that the court violated his due-process rights. Defendant has twice forfeited his challenge to the merits of the court's ruling on the motions *in limine*. See *People v. Staake*, 2016 IL App (4th) 140638, ¶ 80 (noting a " '[f]ailure on the part of a defendant to make a proper offer of proof forfeits review of his challenge to the trial court's granting of a motion *in limine*' " (quoting *People v. Pelo*, 404 Ill. App. 3d 839, 875 (2010))).

¶ 70          Defendant's due-process challenge is vague at best but appears to be grounded in the claim that the trial court should have granted his request for a continuance to secure counsel. The court believed that this request was a delay tactic, and the circumstances support that conclusion. Defendant had ample opportunity to secure counsel prior to the hearing and did not identify an attorney who was ready and willing to enter an appearance in the matter; the motions *in limine* were pending for at least a month prior to the hearing. See *People v. Free*, 112 Ill. App. 3d 449, 454 (1983) (noting that where the defendant had ample opportunity to retain counsel and

there was no counsel identified as being ready, willing, and able to appear, the trial court did not abuse its discretion in denying the motion for a continuance). Even if this issue were not forfeited, the court properly exercised its discretion. *Id.*

¶ 71    Ninth, defendant asserts prosecutorial misconduct based entirely on citations to his own pleadings in the trial court that allege in a conclusory manner that both Brox and postal employees gave false information. He further alleges inconsistencies between the trial testimony of witnesses and the video without directing this court's attention to any specific examples. Putting aside forfeiture, this is woefully inadequate to meet defendant's burden. See *People v. Hanson*, 273 Ill. App. 3d 332, 338 (1995) ("A defendant claiming prosecutorial misconduct has the burden of proof.").

¶ 72                    C. Sufficiency of the Evidence

¶ 73    Defendant also challenges the sufficiency of the evidence relating to three of his convictions. Although defendant did not file a posttrial motion, a challenge to the sufficiency of the evidence supporting a conviction is an exception to forfeiture. See *People v. Cregan*, 2014 IL 113600, ¶ 19. "In reviewing the sufficiency of the evidence in a criminal case, this court asks whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *People v. Jones*, 2023 IL 127810, ¶ 28. "All reasonable inferences from the evidence must be drawn in favor of the State," and we will not overturn a conviction "unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.*

¶ 74    We note that in certain portions of our analysis below, our attention deviates from the sufficiency of the evidence into other tangential legal arguments defendant raises regarding the noted convictions. This is our attempt to fairly address defendant's arguments as best we can.

¶ 75                                    1. *Resisting Arrest*

¶ 76          In order to convict on the charge of resisting arrest, the State was required to prove beyond a reasonable doubt that defendant knowingly resisted arrest by an individual known to him to be a peace officer. See 720 ILCS 5/31-1 (West 2020). Defendant challenges the credibility of Brox's testimony, pointing to alleged inconsistencies in subsequent reports and affidavits. However, a court of review " 'will not substitute its judgment for the fact finder on questions involving the weight of the evidence or the credibility of the witnesses.' " *People v. Galarza*, 2023 IL 127678, ¶ 26 (quoting *People v. Bradford*, 2016 IL 118674, ¶ 12).

¶ 77          Turning to the elements of the charge, defendant argues that Brox's statement that "You're going to jail" was insufficient to provide him notice that he was being placed under arrest. Therefore, he could not have knowingly resisted arrest. " 'Although the intention to arrest must be communicated, and defendant's understanding of that intent is a factor to be considered, "[t]he test must be not what the defendant *** thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes." ' " *People v. Borders*, 2020 IL App (2d) 180324, ¶ 56 (quoting *People v. Howlett*, 1 Ill. App. 3d 906, 910 (1971), quoting *Hicks v. United States*, 382 F.2d 158, 161 (D.C. Cir. 1967)); see 720 ILCS 5/4-5 (West 2020) (stating knowledge can include awareness of the substantial probability a fact exists or that specific conduct is practically certain to produce a stated result).

¶ 78          Defendant was informed numerous times that he would be arrested if he failed to remove himself from the property. Once outside, Brox again reiterated that defendant needed to remove himself from the property. Defendant instead attempted to move toward the front doors of the post office, and Brox physically stopped him from doing so while stating that she would remove him from the property if he did not leave. Defendant continued to move toward the

entrance of the post office after telling Brox not to touch him. Significantly, Brox then warned defendant this was his "last chance," but defendant once again moved toward the entrance of the post office. Brox at that point told defendant he was "going to jail." Defendant stated he was leaving, but Brox informed him he was not. Here, based on the attendant circumstances and repeated warnings of Brox, a reasonable person would have understood that Brox was placing defendant under arrest when she said he was going to jail.

¶ 79    Defendant also challenges his conviction on count II, where he was found guilty of resisting arrest based on his actions of pulling his arm away from Reese. He does not specify how the evidence on this charge was insufficient except to argue that Reese did not testify and the charge was based on the testimony of others that defendant broke his arm free from Reese during the attempt to arrest him. However, this confrontation clause argument is twice forfeited. This claim was not raised at trial and defendant does not support the claim with citation to authority or a coherent argument. As noted, defendant did not argue for plain error, and the constitutional exception to forfeiture does not apply because the claim was not raised at trial. See *Cregan*, 2014 IL 113600, ¶ 18 (finding this exception covers only constitutional issues that were raised at trial). Moreover, the confrontation clause does not guarantee the victim of a crime will testify in person. *People v. Jolliff*, 31 Ill. 2d 462, 464 (1964). The confrontation clause guarantees defendant the right to cross-examine witnesses at trial and prevents the admission of testimonial statements absent the ability to cross-examine. *Crawford v. Washington*, 541 U.S. 36, 51, 54 (2004). Defendant does not point to any acts at trial that violated these protections.

¶ 80    With regard to both charges, defendant alleges the officers were not conducting a lawful act, as they had no authority to arrest him due to the exclusive jurisdiction of the federal government over the post office. However, our prior discussion of jurisdiction above is sufficient

to reject this claim.

¶ 81    Defendant also asserts a one-sentence claim of a violation of the one-act, one-crime doctrine by stating, "Separate resisting charges don't comply with rules of one action on [*sic*] charge." This argument is woefully insufficient to meet defendant's burden on appeal. See *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises*, 2013 IL 115106, ¶ 56 ("[A] reviewing court is not simply a depository into which a party may dump the burden of argument and research."). Nonetheless, "multiple convictions for resisting arrest are appropriate where the record reveals that defendant committed multiple acts of resisting arrest against *** separate officers." *People v. Floyd*, 278 Ill. App. 3d 568, 572 (1996). Here, the State alleged and proved separate acts of resisting arrest sufficient to support both convictions. The record supports the finding that, after being informed he was being detained, defendant broke his arm free from Reese to hand his phone to T.W. and that he tensed up his other arm and pulled away from Brox.

¶ 82                                  2. *Trespass to Property*

¶ 83    Although the State in its briefing lays out an argument that the evidence at trial was sufficient to convict defendant of trespass to property, this argument mischaracterizes defendant's claim of error. In his brief, defendant asserts that "someone can't be trespassed from public property, while peacefully exercising first amendment rights. Defense counsel argued wrong statute charged." Nowhere in this argument does defendant challenge the sufficiency of the evidence to support this conviction; instead, he makes conclusory arguments lacking legal support. See *E.R.H. Enterprises*, 2013 IL 115106, ¶ 56.

¶ 84    We also note that "[n]othing in the United States Constitution, [including the first amendment,] prevents a public entity, be it state or local, from even-handed enforcement of a general trespass law, *vis-a-vis*, public property." *City of Joliet v. Franklin*, 244 Ill. App. 3d 418,

422 (1993) (citing *Adderley v. Florida*, 385 U.S. 39 (1966)). Further, "[a] public entity, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* Moreover, counsel's arguments in the trial court related to the charge in count IV being under the wrong statute, not count V. Compare 720 ILCS 5/31-1(a)(1) (West 2020), with *id.* § 31-1(a)(3). Defendant was convicted on count V and found not guilty on count IV.

¶ 85        In other portions of his briefing, defendant reiterates his jurisdictional argument in relation to this point which we have already rejected. Even if his argument could be construed as challenging the sufficiency of the evidence, our review of the record results in the conclusion the evidence was sufficient.

¶ 86                                    3. *Disorderly Conduct*

¶ 87        To secure a conviction on a charge of disorderly conduct, the State must prove that the accused knowingly acted "in such [an] unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1 (West 2020). " 'Generally, to breach the peace, a defendant's conduct must threaten another or have an effect on the surrounding crowd.' " *Eyler*, 2019 IL App (4th) 170064, ¶ 22 (quoting *People v. McLennon*, 2011 IL App (2d) 091299, ¶ 31). "As a highly fact-specific inquiry, [disorderly conduct] 'embraces a wide variety of conduct serving to destroy or menace the public order and tranquility.' " *McLennon*, 2011 IL App (2d) 091299, ¶ 30 (quoting *In re B.C.*, 176 Ill. 2d 536, 552 (1997)).

¶ 88        The evidence was sufficient to support the charge of disorderly conduct. A review of the evidence reveals defendant engaged in multiple arguments with postal staff concerning recording inside the post office and not wearing a mask. He also approached customers of the post office and informed them it was not the law to wear a mask in the building (we note that defendant

- 25 -

has not argued on appeal that the post office lacked the authority to implement such a policy). The evidence shows he recorded the financial transaction of more than one postal customer after being asked not to do so. As one customer was walking to the counter, he began arguing with Turk, impeding her ability to wait on that customer. The testimony of Osborne, Johnson, and Turk demonstrates that defendant's refusal to comply with requests from staff disrupted postal operations and alarmed those individuals. Even after it was apparent defendant no longer had any business to conduct in the post office, he remained inside, despite the requests of employees to leave.

¶ 89        The theory of the State's case was that defendant preplanned this incident in an effort to record a "first amendment audit" and post that content to the Internet. The State seized on Beverly's comment to defendant, "Is she calling or are we just wasting our time?" It was argued this was in reference to whether Johnson was calling the police to further enhance the content of the recording. This theory was also bolstered by the statement submitted by T.W. that defendant was in fact conducting a "first amendment audit." When viewing the evidence in the light most favorable to the State, it was proven beyond a reasonable doubt that defendant knowingly acted in a manner designed to alarm and disturb another while provoking a breach of the peace.

¶ 90        Defendant argues the first amendment insulates his conduct from prosecution. However:

> "The government, 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' [*Adderley,* 385 U.S. at 47]. The government need not permit free speech activities on all property. It can consider the nature of the property and the disruption which might be caused by the speaker's activities. *Cornelius v. NAACP Legal Defense &*

*Educational Fund, Inc.*, 473 U.S. 788, 799-800 (1985)." *People v. DeRossett*, 237 Ill. App. 3d 315, 329 (1992).

¶ 91    Similar to the police station in *DeRossett*, the Belvidere post office may be open to the public, but it is not a public forum "designated as an area for people to communicate their grievances with the [postal service]." *Id.* at 329. Defendant had every right to mail packages and check his P.O. box, but he could not stage a one-person demonstration against the practices of the Belvidere post office therein. *Id.* Defendant's rights under the first amendment offer him no protection from interfering in the workings of the post office, nor do they insulate his refusal to leave despite the lack of any legitimate business interest therein. *Id.* at 330.

¶ 92    We recognize that the first amendment offers some protections for the recording of "government officials performing their duties in public." *American Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 600 (7th Cir. 2012) (involving video and audio recordings of police officers in public settings). However, as expressed above, the government may impose reasonable time, place, and manner restrictions on speech inside "public" buildings. Here, the post office had a policy against recording other patrons' transactions in order to protect their privacy. The evidence shows that defendant violated this restriction. He also violated a restriction concerning mask-wearing, a matter that is entirely unrelated to his speech rights. While defendant's "first amendment audit" seems to have been designed to probe the boundary between his first amendment rights and the legitimate operational concerns of the post office, he also showed a great lack of care about where that line is drawn and how he himself might errantly step over it. Here, it was defendant, not the post office employees or police, who found himself on the wrong side of the line.

¶ 93                            D. Assistance of Counsel

¶ 94        Defendant also argues he received ineffective assistance of counsel. To prevail on an ineffective-assistance claim, a defendant must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance arguably prejudiced the defendant. *People v. Veach*, 2017 IL 120649, ¶ 30 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). A failure to satisfy either prong precludes a finding of ineffectiveness. *People v. Simpson*, 2015 IL 116512, ¶ 35.

¶ 95        Regarding the first prong, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *People v. McGath*, 2017 IL App (4th) 150608, ¶ 38. Regarding prejudice, a defendant must demonstrate "that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694).

¶ 96        The basis of this argument appears to be that defendant believes that counsel did not have sufficient time to investigate a defense of selective prosecution and that, if allowed more time to prepare for trial, counsel would have been able to present this defense. "Trial counsel has a professional duty to conduct 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *Id.* ¶ 38 (quoting *Strickland*, 466 U.S. at 691). " 'Lack of investigation is to be judged against a standard of reasonableness given all of the circumstances, "applying a heavy measure of deference to counsel's judgments." ' " *Id.* (quoting *People v. Kokoraleis*, 159 Ill. 2d 325, 330 (1994), quoting *Strickland*, 466 U.S. at 691).

¶ 97        We note that a claim of selective prosecution is not an affirmative defense to be

asserted at trial; rather it is a pretrial claim that, if proven, results in the dismissal of the case. *People v. Sims*, 2022 IL App (2d) 200391, ¶ 103; *People v. Peterson*, 397 Ill. App. 3d 1048, 1054 (2010). Here, defendant points to a video in the record where a "white individual" entered the same post office subsequent to defendant's arrest and records. (While documents in the record indicate defendant is "white," he claims in his briefing that he is "Hispanic.") However, simply pointing to a variance in race is insufficient. Defendant needed to show that this individual was similarly situated. *United States v. Armstrong*, 517 U.S. 456, 457 (1996). A review of this recording shows that the individual was asked to stop recording at the counter to protect the financial information of other customers; that he did not record the transactions of other customers; and from the muffled sound of his voice in the video and the lack of a request from postal staff to put on a mask, it appears the individual was abiding by the masking policy. This recording does not show a "prosecutorial policy" resulting in a "discriminatory effect *** motivated by a discriminatory purpose." *Id.*

¶ 98       Aside from this video, defendant fails to argue the existence of any evidence that would meet the "rigorous standard" required for such a claim. *Id.* at 468-469. Given the lack of evidentiary support for the claim, counsel made a reasonable decision, rendering investigation into this particular claim unnecessary. See *Domagala*, 2013 IL 113688, ¶ 38.

¶ 99       Defendant also asserts ineffective assistance of counsel due to the fact that Reese did not testify at trial. However, as explained above, the confrontation clause does not guarantee the victim of a crime will testify in person. *Jolliff*, 31 Ill. 2d at 464. The decision not to call Reese to testify was likely a matter of trial strategy to prevent the testimony of a third member of law enforcement from buttressing that of Brox and Berillo. See *People v. Watson*, 378 Ill. App 3d 580, 589 (2007) (noting that counsel's trial strategy is " 'virtually unchallengeable' " and generally does

not support a claim of ineffective assistance of counsel).

¶ 100                                     III. CONCLUSION

¶ 101        For the reasons stated, we affirm the trial court's judgment.

¶ 102        Affirmed.